**PALMER et al. v. WARREN et al.**

Nos. 38–98.

Circuit Court of Appeals, Second Circuit.

Dec. 18, 1939.

Rehearing Denied Jan. 25, 1940.

Writ of Certiorari Granted March 4, 1940.

See 60 S.Ct. 607, 84 L.Ed. ——.

the New Haven rejected its lease of the property of the Old Colony (June 3, 1936) and December 31, 1937; and further to determine and declare whether this deficit was a lien upon the road. The second order, entered April 20, 1939, liquidated the amount of the deficit, and charged it as a lien prior to general creditors—there was no mortgage. The Boston & Providence is a Massachusetts corporation and the owner of a railroad, running, as its name implies, between Boston and Providence; in 1888 it leased all its property for 99 years to the Old Colony, also a Massachusetts corporation, owning and operating a network of lines in that state. In 1893 the Old Colony in turn leased its own lines—including the term for years that it held of the Boston & Providence—to the New Haven; also for a term of 99 years. The New Haven operated all three roads until, having become insolvent, it was put into reörganization under § 77 of the Bankruptcy Act, on October 23, 1935, and Palmer and others were made its trustees. The trustees continued to operate the Old Colony as lessees until June 3, 1936, when, by order of the bankruptcy court they rejected the lease, and they thereafter operated it by virtue of an order, presumably made under subdivision c(6) of § 77, although the order did not so recite. All three roads had run at a deficit for the first seven months, and on June 3, 1936, the Old Colony was also put into reörganization under § 77. Since the New Haven held a majority of its shares, the court united the two proceedings, as the statute allows (sub. a), and appointed the same trustees.

The deficits still continued, and on July 19, 1938, the court instructed the trustees to reject the Boston & Providence lease, which they did; though they continued, as before, to operate both roads at the court's order under sub. c(6) of § 77. On August 4th, 1938, the Boston & Providence was put into reörganization, and Warren and others were appointed its trustees. That proceeding was in the District Court of Massachusetts, and could not have been united with the joint one at bar, because neither the New Haven, nor the Old Colony, owned a majority of the Boston & Providence shares, as required by sub. a of § 77. The appeals (over both of which we have jurisdiction, Robertson v. Berger, 2 Cir., 102 F.2d 530) involve the following questions: (1) whether the Connecticut court had jurisdiction to declare that the Boston & Providence operating

Erwin N. Griswold, of Cambridge, Mass., for appellants.

Hermon J. Wells and J. H. Gardner, Jr., both of New Haven, Conn., for appellees.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The Boston & Providence R. R. Corporation and its trustees in reörganization appeal from two orders, entered in a joint proceeding under § 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, to reörganize the New York, New Haven and Hartford R. R. Co. and the Old Colony R. R. Co. The first of these orders, entered January 16, 1939, decided that the bankruptcy court had jurisdiction to determine the amount of the deficit caused by the operation of the Boston & Providence between the day when

deficit between June 4, 1936, and December 31, 1937, was a lien upon the Boston & Providence reversion; (2) if so, whether that court was right in declaring that the deficit did constitute a lien; (3) whether the amount found was correct.

### (1) The Jurisdiction of the Connecticut Court.

The Supreme Court has laid it down in numerous decisions that a court, state or federal, which has once lawfully assumed custody of property, may adjudicate any claims against it, not only when the claimant intervenes in the suit and asks that his rights be declared, but when the court cites him in in invitum.[1] Courts of other jurisdictions will recognize its judgment as res judicata, and it may enjoin claimants from prosecuting their rights elsewhere, except as it finds it more convenient to allow them to do so. All this is entirely familiar law, and the Boston & Providence does not dispute it; it says that it is inapplicable, because the district court never came into possession of its property. The argument is that the Old Colony got only a term for 99 years; and that the district court could take possession of no more than the lessee had had. This misconceives the nature of the doctrine, which depends merely upon possession in the natural sense that the court's officers are in control of the property de facto and can exclude all others. Indeed it would be scarcely practicable to adopt any other basis for jurisdiction. Were it necessary that the court should have possession of the insolvent's legal interest in order to adjudicate it, it would follow that every erroneous judgment would be beyond its proper jurisdiction, and it would have the right to act only when it acted correctly. Moreover, we can attach no meaning whatever to the "possession" of a legal interest in a thing, except as it means possession of the thing as an object of nature. The reason lying back of the whole doctrine is practical rather than conceptual, as appears very plainly when the dispute concerns the right to possession. A court, which has custody of the res, must at some time surrender it, and it can know to whom it should deliver only in case it either decides the right to possession itself, or awaits the action of such other competent tribunal as the claimant may choose. The second course subjects it to an indefinite delay in the dispatch of the cause before it, and may effectively cripple its powers. The same is not indeed true where the claimant demands, not the right to possession, but a lien or other similar interest in the res; the custodial court might then content itself with learning who was entitled to possession, and leave any other interests unadjudicated; indeed that is what it does in cases like a bare possessory libel in the admiralty, for instance. But this would leave incomplete the purpose of the main suit, if, as is generally the case, that is the distribution of the assets in its hands, which presupposes that all liens have been ascertained. In the case at bar the New Haven is not, it is true, resisting a lien; it is itself the claimant, a putative lienor. But, although, so far as we have found, that situation has not come before the courts, it seems to us plainly a variant of a claim to the right to possession. If the roads were private corporations, there could be no doubt about this. The Boston & Providence would in that case be asserting the right to possession, which the New Haven and Old Colony would be resisting on the ground that they had a lien on the road; it would be a typical case in which the court would have jurisdiction. Because the Boston & Providence is a public servant, and cannot, for the present at least, be operated as a separate carrier, this result is disguised; it and the Old Colony must be operated under the control and possession of the New Haven; sub. c(6) of § 77. But we can see no reason why this should falsify the relations between the two roads themselves; indeed, if it has any effect upon them, it is to confirm our conclusion, for the New Haven's possession is not likely to be disturbed. It may possibly be true that the Connecticut court will have to resort through its trustees to the Massachusetts

[1] Ex parte Christy, 3 How. 292, 11 L. Ed. 603; Whitney v. Wenman, 198 U.S. 539, 25 S.Ct. 778, 49 L.Ed. 1157; Wabash Railroad Co. v. Adelbert College, 208 U.S. 38, 28 S.Ct. 182, 52 L.Ed. 379; Murphy v. John Hofman Co., 211 U.S. 562, 29 S.Ct. 154, 53 L.Ed. 327; Hebert v. Crawford, 228 U.S. 204, 33 S.Ct. 484, 57 L.Ed. 800; Chicago Board of Trade v. Johnson, 264 U.S. 1, 11, 44 S.Ct. 232, 68 L.Ed. 533; Taubel, etc., Co. v. Fox, 264 U.S. 426, 432–33, 44 S.Ct. 396, 68 L.Ed. 770; Isaacs v. Hobbs Tie & T. Co., 282 U.S. 734, 51 S.Ct. 270, 75 L.Ed. 645; Straton v. New, 283 U.S. 318, 321, 51 S.Ct. 465, 75 L.Ed. 1060; Ex parte Baldwin, 291 U.S. 610, 615, 617, 54 S. Ct. 551, 78 L.Ed. 1020; Harris v. Avery Brundage Co., 305 U.S. 160, 163, 59 S. Ct. 131, 83 L.Ed. 100.

court to realize upon the lien. If so, it is because distribution of the Boston & Providence assets—more properly the new allocation of interests in them—has been confided to the Massachusetts court. But that need not affect the power of the Connecticut court to liquidate and fix the rank of the lien. Nor would a consistent application of this reasoning require us to extend the jurisdiction of the Connecticut court to the collection of unsecured claims of the New Haven against third persons. The presence of the debtor within reach of the court's process is not a condition upon the exercise of power to declare legal interests in property which is in gremio legis. The fact that the Connecticut court could go no further and hold the Boston & Providence generally liable, is no reason why it may not declare what interests the New Haven and Old Colony have in its road.

Finally, the Boston & Providence argues that since § 77 sub. a gave "exclusive jurisdiction" to the Massachusetts court over "the debtor and its property wherever located", that court alone may adjudicate the lien. That, however, is a sword with two edges, for the Connecticut court had an equally "exclusive jurisdiction" over the "property wherever located" of the New Haven and of the Old Colony. The lien is as much their "property" as the encumbered fee is the Boston & Providence's, and the res to which the lien attaches is the same as that in which the fee resides. Granting arguendo that each court has "exclusive jurisdiction" over the legal interests of its debtor in the res, so far as those interests do not conflict, each cannot have it when they do, and there is no reason à priori to prefer one court over the other. In that logical dilemma we can only resort to the doctrine normally applicable in such cases; i. e., that the court first taking over the res, draws to itself power to determine all claims upon it.

Nor is this conclusion affected by the fact that Congress deliberately refused to provide for the joint reörganization of lessors and lessees, unless one held a majority of the others' shares. Mere liquidation of the lien is in no sense a joint reörganization of the three roads. It is quite true that if one corporation in reörganization has a claim upon the assets of another in reörganization, the court of the first has no power to liquidate that claim as part of the reörganization; the first corporation must be content to present its claim and take what the plan of the second gives it in exchange, merely as one of its own assets to be dealt with in its own reörganization, like any other; a dividend in bankruptcy, for example. Nevertheless the mere fact that the court of the first corporation liquidates the claim because it has possession of the second's property, does not make the two reörganizations one. That would not even be true, though the court followed liquidation by assuming to declare what interest in the second corporation the first should receive in exchange for the lien. To do so would indeed pro tanto impinge upon the plan of the second (except in the rare case where the lien was not "adversely and materially affected by the plan" sub. e, § 77); but it would still be untrue to say that there would be only a single reörganization. And if the power of the first court must end with liquidation, and if the first corporation can receive in exchange for its adjudicated lien only that interest which the plan of the second gives it, plainly it would be absurd to say that there was a single reörganization. We cannot agree therefore that the order of January 16, 1939, assumed a power which § 77 forbade. No doubt the Connecticut court might, had it chosen, have left it to the Massachusetts court to liquidate the claim; any court having custody of a res may always do that. But there was the plainest justification for not doing so here. Precisely the same questions arose between the New Haven and the Old Colony and had to be dealt with in this proceeding; not only would it have involved a duplication of labor to refuse jurisdiction but it might have resulted in contradictory rulings upon the same issue. The order is affirmed.

### On the Merits.

The second order on appeal, Order No. 301, liquidated the deficit until December 31, 1937; it went no further because the New Haven's "Report of Administration" stopped at the end of that year. The controversy arises over the judge's ruling that by its participation in certain earlier proceedings, especially those terminating in Order No. 300, the Boston & Providence was estopped to contest the New Haven's and Old Colony's demand. This involves some statement of the proceedings in the Connecticut suit. On June 18, 1936, shortly after the Old Colony went into reorganization, the judge passed Order No. 75, paragraph nine of which declared that in case the Old Colony should reject any contract or lease—the Boston & Providence lease was not named—"the operation of the

leased property shall have been * * * for the account of the lessor and such payment shall be * * * charged on the earnings and properties of the land, prior to any mortgage or other lien". The court had already made a similar order on November 30, 1935, respecting the New Haven—Order No. 17—and its trustees had undertaken certain "segregation studies" which seemed to show that the Boston & Providence was being operated at a loss. On October 7, 1937, the Bankers Trust Company, a mortgagee of the New Haven, filed a petition ("Petition for Order No. 217") requesting the court to stop the rentals upon the Boston & Providence lease. The Boston & Providence, which on May 27, 1937, had already appeared generally in the suit, opposed this, and the judge refused the relief at that time, but directed the New Haven trustees to prepare a complete account up to the end of the year 1937 for his information. This they did, adopting a "Segregation Formula", by which to apportion the deficit equitably between the Old Colony, the Boston & Providence, and a third road, the Providence, Warren & Bristol, over the period from October 24, 1935, to December 31, 1937. They submitted this report to the Interstate Commerce Commission for its approval, and the Boston & Providence appeared before the Commission also, seeking a more favorable distribution of the burden. The Commission reported back to the court on April 15, 1938, that the account was "as fair and equitable as the circumstances permit", and on the 19th the New Haven and Old Colony trustees filed their "Report of Administration", including their accounting and the Commission's action. While this was not in form a petition, it concluded with a prayer that the court should approve the annexed accounts, and should declare the deficit to be "a charge on the earnings and/or properties of said subsidiary debtors prior to any mortgage or other lien thereon as expenses of administration". The Boston & Providence filed objections to this report on April 30, 1938; the day before it had filed a petition ("Petition for Order No. 276") for an order modifying paragraph 9 of Order 75 so as to provide that in case of the rejection of any lease by the Old Colony the court should reserve "for future determination all questions arising out of any such * * * rejection concerning rights and liabilities * * * for operation of the leased properties and for payments made". The court did not dispose of this petition, but held hearings on the trustees' "Report of Administration" in May and June, at which the New Haven made its proof. The Boston & Providence took part in these hearings, examined witnesses, and offered some evidence. Thereupon, on July 18, 1938, the court entered "Order No. 300", approving the "Report of Administration", and fixing the joint operating deficit of the Old Colony, the Boston & Providence, and the Providence, Warren & Bristol Railroad, from October 23, 1935, to December 31, 1937, at $11,789,000. This it allocated as follows: $5,775,000 against the Old Colony, $5,461,000 against the Boston & Providence, and $552,000 against the Providence, Warren & Bristol. The deficits against the Old Colony and the Boston & Providence were declared to be a charge upon the "earnings and property of the Old Colony Railroad Company as an expense of administration prior to any mortgage or other lien thereon". On the next day the court decided the "Petition for Order No. 217" of the Bankers Trust Company by directing the Old Colony trustees to reject the lease, to cease making any payments under it, and to operate the road under subdivision c(6) § 77. This order concluded as follows: "The Court reserves for further hearing the right to determine the existence and amount of any obligation of the Boston & Providence arising out of operation of its property or payments made to it or on its behalf prior to the rejection of its lease, and the liability of the Boston & Providence therefor to the Old Colony estate and by way of subrogation to the New Haven estate. And pending such determination the Court will withhold its final ruling on "Petition for Order No. 276". The New Haven and Old Colony on July 29th filed a petition for the approval of their accounts against the Boston & Providence, showing a deficit of $3,955,000, which they prayed should be charged as a prior lien on its property ("Petition for Order No. 301"). The amount claimed differed from the deficit awarded against the Boston & Providence by Order No. 300, because the period of the accounting began only with the repudiation of the Old Colony lease, June 4, 1936.

Thus there remained open on August 1, 1938, only the petition of the Boston & Providence for Order No. 276, and the petition of the New Haven and Old Colony trustees for Order No. 301. The Boston & Providence, having meanwhile gone into reörganization, first filed objections to

the jurisdiction of the court over "Petition for Order No. 301", which the judge overruled on January 16, 1939. That is the order which we have already affirmed. He then held hearings on the merits; but because he thought that all questions had been finally settled by Order No. 300, he refused to receive any evidence as to the correctness of the "Segregation Formula", or to permit a fresh liquidation of the Boston & Providence's share of the deficit. He liquidated the claim at the amount prayed in the petition and declared that it was secured by a prior lien upon the property of the Boston & Providence, in reduction of the lien imposed upon the Old Colony by Order No. 300. On May 5th he entered another order denying "Petition for Order No. 276". The second appeal is from Order No. 301, entered April 20, 1939.

The New Haven and Old Colony seek to support the judge's ruling upon the same grounds which he gave himself; that is, that the Boston & Providence had appeared generally in the proceeding, had objected to the Bankers Trust Co.'s "Petition for Order No. 217", and to the trustees' "Report of Administration" which followed upon it. They say that, having been heard at length, the road was not free to relitigate any of the questions decided, among which was the proper apportionment of the deficit and the validity of the lien. Had it not been for the concluding paragraph of Order No. 217, conceivably this reasoning might prevail; but we cannot see how it can survive what was there declared. When originally submitted to the judge, paragraph five of the order provided that all operating expenses since June 3rd, 1936, should be deemed made on behalf of the Boston & Providence and should be prior liens. However, the Bankers Trust Co., which presented the order, agreed to add as a suffix the language we quoted above. The Boston & Providence protested that this would determine its liability and leave nothing to decide but the accounting, if it even left that; and the judge observed that the suffix nullified the main provisions, and suggested that the earlier part be omitted. It was then objected that Order No. 75 in substance provided the same thing. To this the judge replied: "I say these items shall be charged by such method as the court shall determine. And now, at Mr. Warren's request, I am going to say they shall be determined at a further hearing". In view of this we cannot see what else the

order meant than that "the existence and amount of the obligation" was to be left at large, and not deemed concluded by Order No. 300. Indeed, the judge indicated several times at the hearings upon the "Report of Administration" that he understood that the Boston & Providence must have a separate hearing upon its liability. And in his opinion, although he quoted the language of paragraph five of Order No. 217, he did not discuss its effect, being apparently concerned only with that of Order No. 300, taken alone. What was so left open, i. e., "existence and amount of the obligation," covered the whole dispute. Certainly the "amount of the obligation" included the apportionment of the deficit and opened the "Segregation Formula" to attack. If it be argued that it did not open the existence and rank of any lien securing the "obligation" and that Order No. 300 might be an estoppel as to that, the last sentence lays any doubts, for it declared that the court would defer action upon "Petition for Order 276", and that asked a modification of Order 75 so that the deficit, among other payments, should not become a lien upon the property of the Boston & Providence. What then was left for the estoppel of Order No. 300? If it was proposed to treat that order as an estoppel as to any of these matters, paragraph five was, to say the least, extremely misleading. Whether the Boston & Providence would have appealed from Order No. 300, if not so assured, we cannot indeed know; but surely it was entitled to assume that it need not do so. On this record it appears not to have had its day in court, and the order must be reversed so that it shall.

Order of January 16, 1939, affirmed.

Order No. 301 reversed.

On Petition for Rehearing.

PER CURIAM.

Our opinion seems to have been misunderstood and perhaps was not clear. We agree with the New Haven if it means no more than that the Boston & Providence cannot now procure any change by the Commission in the "Segregation Formula" itself. However, we meant to decide before, and we now decide again, that the Boston & Providence is free to oppose the application by the District Court of that formula to the liquidation of its account with the debtors as freely as though Order No. 300 had not been entered.