In the Matter of **BOSTON & PROVI-DENCE RAILROAD CORPO-RATION, Debtor.**

**No. 62413.**

United States District Court
D. Massachusetts.

Nov. 8, 1966.

Charles W. Bartlett, Boston, Mass., for Charles F. Mulcahy.

Robert W. Blanchette, New Haven, Conn., and James Garfield, Boston, Mass., for N. Y. N. H. & Hartford R. Corp.

Benjamin H. Lacy, Boston, Mass., for B. & P. R. Corp. Stockholders' Committee.

Laurence M. Channing, Boston, Mass., for Debtor Corp.

Armistead Rood, Washington, D. C., and Joseph B. Hyman, Alexandria, Va., for B. & P. Development Group.

Paul A. Sweeney, Sp. Asst. Atty. Gen., Dept. of Justice, Washington, D. C.

In Proceedings for the Reorganization of a Railroad

## OPINION

FRANCIS J. W. FORD, District Judge.

On August 4, 1938 the Provident Institution for Savings in the Town of Boston, then the holder of the fifteen-year, five percent, gold debenture bonds of the Boston & Providence Railroad Corporation (debtor), issued in the aggregate amount of $2,170,000 and payable on July 1, 1938, instituted proceedings, No. 62413, in the United States District Court for the District of Massachusetts for reorganization of the debtor in accordance with the provisions of section 77 of the Bankruptcy Act (11 U.S.C. § 205). In the ensuing years, the Commission has thrice approved plans for reorganization of the debtor. The last occasion was on January 5, 1954, 290 I.C.C. 363, petition for modification denied, 290 I.C.C. 404. And this plan survived challenge in the courts. In re Boston and Providence Railroad Corp., 143 F.Supp. 866 (D.Mass.1956), affirmed insofar as reorganization plan is concerned sub nom., Freeman v. Mulcahy, 250 F.2d 463 (1st Cir. 1957), cert. denied sub nom., Boston & Providence Railroad Corp. v. New York, New Haven & Hartford Railroad Co., 356 U.S. 939, 78 S.Ct. 781, 2 L.Ed.2d 813 (1958). The matter of reorganization of the debtor is again before the Commission by virtue of findings the Commission made on March 7, 1960, after petition of the Boston & Providence Railroad Corporation Group of Stockholders (Development Group) pursuant to 11 U.S.C. § 208, that developments had occurred since approval of the plan, not provided for therein, requiring reexamination and reconsideration of the plan. In view of these findings this Court remanded the plan to the Commission.

As a result of events occurring since the remand of the plan, a proposed plan of reorganization of the debtor, dated October 10, 1963, with subsequent amendments, was submitted by Gerald P. Kynett, C. Shelby Carter, and Enos Austin, as the Boston & Providence Railroad Corporation Stockholders Committee. The Stockholders Committee represents 16,244 shares of the 20,770 shares of stock of the debtor in the hands of the public, as distinguished from those held by the New York, New Haven & Hartford Railroad Company (New Haven). Public hearings on the basic plan were held before the examiner from April 27 through May 1, 1964. The record was then closed. However, as a result of the filing of second and third amendments to the plan, the Commission, Division 3, by orders of September 23, 1964 and February 19, 1965, reopened the record and directed that further hearing be held restricted to adducing evidence concern-

ing these amendments. Such hearing was held March 9 and 10, 1965. On March 11, 1966 the Commission issued its Seventh Supplemental Report and entered an order approving the proposed plan, 327 I.C.C. 10.

The plan now before the court provides in substance for the transfer of substantially all the debtor's assets, properties and franchises to the New Haven and the ultimate liquidation of the debtor, a mutual cancellation by the debtor and its trustees and the New Haven and its trustees of their claims against one another (except for the debtor's debentures discussed below) and for compensation of the creditors and stockholders. Also the plan provides for an amendment of the debtor's charter to relieve it from any obligation to use or pay for the use of the South Station in Boston. The plan provides for the acquisition by New Haven of the 50% interest of Boston & Providence Railroad Corporation in the Union Freight Railroad Company. The plan further provides for the appointment of four reorganization managers to carry out the plan, one by the Government, one by the Boston and Providence Railroad Corporation Stockholders Committee, one by New Haven Trustees and one by the Boston & Providence Trustee. (See 327 I.C.C. 37 as to powers of managers.) The plan provides for the payment of $110 a share to each holder of the publicly-owned stock.

The effective date of the plan is to be December 31, 1963. Taxes due from the debtor for 1963 and prior years will be paid from cash presently belonging to the debtor. Taxes for 1964 and subsequent years will be paid by the trustees of the New Haven. Debts of the debtor's trustee, proved and allowed claims against the debtor and costs of administration will be paid from a cash fund of $550,-000, made up of cash remaining after payment of taxes by the debtor, and, if necessary, of funds to be contributed to the extent of $150,000 by the New Haven trustees. As of June 30, 1966 debtor's trustee had cash and temporary cash investments in the approximate amount of $2,059,612 which does not include $119,-

000 in the sinking fund. Real estate taxes through December 31, 1963 amount to $1,013,748.07 plus interest of $225,-715 (total of $1,239,463.07). These provisions will dispose of all claims except those of the debenture holders and stockholders.

The debtor's obligation on its 5 per cent debentures, due January 1, 1938, as of December 31, 1963 aggregated $4,-991,000, comprised of $2,170,000 principal amount and $2,821,000 in accrued interest. The New Haven is now the owner of all these debentures and they have all been pledged to the United States as collateral security for so-called "flood loans" made to the New Haven. Under the plan the existing debentures are to be cancelled. In exchange therefor new bonds will be issued, maturing in 15 years from December 31, 1963 and bearing interest at 4½ per cent. The New Haven will be the sole obligor on these bonds, which will be secured by a first mortgage on the debtor's real estate. This lien will be subject, however, to the equitable charge described below. As part of the plan the United States and the New Haven have agreed to cancellation of $1,491,000 of the new bonds and payment of the remaining $3,500,000 by the New Haven in annual installments of specified amounts.

The outstanding stock of the debtor consists of 15,918 shares owned by the New Haven, 3272 shares in the debenture sinking fund, 40 shares in the debtor's treasury, and 20,770 shares held by members of the public other than the New Haven. Under the plan the treasury shares and the sinking fund shares will be assigned to the New Haven.

In addition Certificates of Contingent Beneficial Interest (CCBIs) are to be issued (one CCBI for each share of stock) to all stockholders of the debtor, the New Haven receiving CCBIs for its own stock and for the treasury and sinking fund shares assigned to it. Each CCBI entitles its holder to a proportionate share of the net proceeds of any conveyance (including a lease or taking by eminent domain) by debtor's trustee, or by the New Haven or its successors, of

real estate of the debtor in a transaction involving a gross sales price or award of $500,000 or more, made on or before December 31, 1978. These payments are to be secured by an equitable charge on the debtor's real estate, to be given by debtor's trustee by indenture to a charge trustee to be appointed by the court. Provision is made for the charge trustee to retain a Director of Development to promote sales of the debtor's real estate in transactions involving $500,000 or more. The proceeds accruing to the New Haven from CCBIs held by it are to be devoted to retirement of the bonds held by the United States.

This plan is now before the court after approval by the Interstate Commerce Commission. Approval of the court is requested by the debtor, its trustee, the New Haven, the United States, and Boston and Providence Railroad Corporation Stockholders Committee.

██ The only objector to the plan is the Boston & Providence Railroad Development Group. The question has been raised, both before the Commission and in this court, whether counsel for the Development Group in opposing the approval of the plan actually represent the wishes of any party entitled to be heard. On the basis of the testimony at the hearing on the plan of one individual owner of 123 shares, the court finds that counsel for the Development Group represent at least his interest and therefore are entitled to be heard. At most, the Development Group claims to represent five or six shareholders owning a total of about 2500 of the 20,770 shares held by the general public.

The first two of the Development Group's objections are directed against the provisions incorporated in the plan with respect to the CCBIs. These provisions were included because of the potential value of certain portions of the debtor's real estate, based on the price which would be received for this land if it should be sold or taken for highway or rapid transit purposes. There is, of course, no certainty that any of this land can be so disposed of and hence no firm basis for including this contingent value as an element in the compensation to be paid by the New Haven for the debtor's estate. Therefore the plan includes the CCBI provisions as a device for assuring the public stockholders of the debtor of their fair share of any "windfall profit" should any of these potential values materialize within the reasonably immediate future.

Development Group in general objects that the CCBI provisions are too loosely drawn and leave open the possibility that the New Haven may defeat possible sales of the property or by various subterfuges may dispose of the property so as to retain the profits for itself. The Group further contends that the provisions do not insure that adequate efforts will be made to promote profitable disposition of the property by sales which will benefit the holders of the CCBIs.

██ The objectors appear to concede, however, that the additional detailed provisions need not be included in the plan itself so long as they are spelled out in the indenture. A copy of the proposed indenture has already been filed with the court. Its specific provisions appear to remedy any vagueness in the provisions of the plan itself to which legitimate objection might be made. The provisions cannot be so detailed and rigid as to leave the charge trustee and the Director of Development no flexibility in dealing with whatever opportunities arise for disposing of the real estate. The plan makes provision for arbitration of differences which may arise, to be set forth in the indenture of equitable charge, between the grantor and the charge trustee in defining a transaction or the amount of gross sales or award or net proceeds received from a conveyance. (327 I.C.C. 32.) Finally, the trustee who will be responsible for effectively carrying out the disposition of the property is to be appointed by the court. It cannot be held that the plan does not make at least reasonably adequate provisions for the protection of the interest of the stockholders of debtor with respect to the possible "windfall" dispositions of debtor's real estate.

It is further objected that in approving the plan the Commission adopted a valuation of the debtor's property not made in accordance with applicable legal standards and unsupported by substantial evidence of debtor's earning power, past, present and prospective. Valuation of the property of a railroad is a function of the Commission (Freeman v. Mulcahy; supra, 250 F.2d at 472), and the review of its determination by the court is limited to the question of whether the Commission's conclusion was made in accordance with legal standards and supported by substantial evidence. (Cf. In re Boston & Providence Railroad Corp., D.C., 143 F.Supp. 866, 873–875.) The Commission has had long and close familiarity with the problems of the debtor and of the New Haven system of which it is operated as an integral part. From the Commission's opinion, 327 I.C.C. 17–21, 22, and the examiner's report on valuation (adopted by Commission (321 I.C.C. 21) (Examiner's report June 14, 1965, pp. 10, 11, 12)) it is clear that careful consideration was given to all the relevant elements of value, and in particular due consideration was given to the earning power of the property. It was necessary to re-examine the 1954 plan (312 I.C.C. 120) in the light of the principles set forth in § 15(6) of the Interstate Commerce Act as required by the amendment to § 77(c) (6). (327 I.C.C. 19, 20) It is agreed by all the parties that this is not a 15(6) case. As the Commission found, New Haven since 1958 has failed to earn sufficient revenue to cover its operational expenses, or taxes, or return on property invested. Thus reasoned the Commission, and rightly: "There would be no justification for requiring New Haven to make any greater contribution towards the expenses of the debtor or to contribute to a rate of return on its property investment. This would merely rob Peter to pay Paul." Boston & Providence Railroad Corp. had no earning power apart from New Haven. The evidence of the representatives of New Haven and of the experts of the Stockholders Committee, substantially uncontradicted, adequately supports the conclusion of the examiner and of the Commission that the Boston and Providence lines have been an unprofitable operation which contributed a substantial share of the operating losses of the New Haven system. There was no justification for the Commission to apply § 15(6) so as to make the debtor's lines a profitable segment of an unprofitable operation. The section does not in such circumstances require an unjustified distortion of the figures to guarantee to a lessor railroad a profit on its operations. The projections of the Development Group as to potential earnings of the debtor's lines in the event of the consummation of the proposed Pennsylvania-New York Central-New Haven merger are optimistic speculations. It cannot be said that the Commission, in the light of its experience and specialized knowledge, erred in giving them no more weight than it did. .

The principal objection of the Development Group is that the plan improperly recognizes the validity of the debtor's debentures.[1] They argue that the court should declare the debentures wholly invalid, and that consequently, since part of the consideration to be given by New Haven for acquisition of debtor's property is the cancellation of its claim to payment of the debentures, New Haven's cash payment to the stockholders should be increased accordingly.

These debentures were issued in 1923 by the debtor under provisions of the lease of its properties to New Haven. Under the lease provisions, money for the payment of the debtor's obligations under the indenture was to be furnished by payments of New Haven as lessee. In 1954, during the pendency of these proceedings, New Haven by purchase from the then holder, became owner of all the debentures. As has been stated, the debentures were subsequently

---

1. Other parties such as the debtor, its trustee, and the Stockholders Committee have also contended the debentures are invalid, but they nevertheless urge approval of the plan as it stands.

pledged to the United States as collateral, and are now held by the United States as pledgee.

The claim of invalidity is based on the argument that under the terms of the lease the New Haven was really the principal obligor on these indentures with the Boston and Providence only a surety, and that consequently when New Haven, as principal obligor, became also the holder, the obligations on the instruments were discharged. Alternatively, they argue that if debtor is liable to New Haven for payment of the debentures, New Haven is liable in an equal amount to debtor under its obligation to provide the funds to pay the debentures, and that set-off of these claims should result in extinguishment of any liability of the debtor on the indentures.

The Commission, finding it had no jurisdiction to determine the validity of the debentures, left the question to be determined, if necessary, by the court, and stated it was approving the plan on the assumption that the debentures were valid. However, it is clear that under the plan, the United States, the pledgee of the debentures, has agreed to take something substantially less than the full amount of its claim. If the debentures are fully valid, it has a claim for $4,991,-000 which must be paid before anything is paid to the stockholders. What it receives in return is $3,500,000 in principal amount of the new bonds. Moreover, it has agreed that the mortgage securing these bonds is to be subordinated to the equitable charge securing the CCBIs.

Litigation of the validity of the debentures would undoubtedly be protracted.[2] Not only would this add to the 28 years during which this court has been continually concerned with these proceedings, but it would seriously endanger the possibility of consummating any satisfactory plan. After the 1954 plan had been approved by this court and the Court of Appeals, the time lapse caused by subsequent delaying proceedings initiated by the Development Group was so long that eventually the New Haven was no longer in a financial position to make the payments required of it and the plan became unfeasible. Today, the financial position of the New Haven is such that undue prolongation of litigation over this plan may produce a similar result. This should not take place in the light of the treatment of the debentures in the present plan.

If the validity of the debentures is litigated, a final decision against validity will eliminate any payment to the United States in these proceedings while increasing the amount to be paid to the stockholders. A decision for validity will entitle the United States to the full amount of its claim and thus sharply reduce the payment to the stockholders.

■■ It is not necessary for the approval of a plan that the validity of every disputed claim be litigated. For example, the courts have held the unadjudicated claims of New Haven and debtor arising out of the disaffirmance of the lease and New Haven's subsequent operation of the debtor's lines could be compromised and cancelled. (In re Boston & Providence Railroad Corp., supra, 143 F.Supp. p. 875; Freeman v. Mulcahy, 1 Cir., 250 F.2d 463, 475) In many cases, and certainly here, it is best for the interests of all parties to compromise their differences. Here, a compromise has been worked out after long negotiations which is regarded as a fair one under the circumstances by all the interested parties except a very small minority of the stockholders. In view of the risks and delays of litigation and the serious danger that the whole plan might be defeated the approval of a compromise treatment of the debentures was proper. The Commission has fixed a compromise value for these unadjudicated claims which the court regards as binding on this court when supported by the evidence and not contrary to law. It

---

2. Involved are not only the question of validity itself, but a question of whether this court or the Connecticut court having jurisdiction of the New Haven reorganization is the proper tribunal to pass on the validity of the debentures.

so finds. (Ecker v. Western Pacific Railroad Corp., 318 U.S. 448, 472, 63 S. Ct. 692, 87 L.Ed. 892)

■ The procedure of treating the debentures as valid, as they appear on their face to be, but of paying the United States only a part of the face value of its claim in the light of the serious challenge to the validity of the debentures was a proper one. It can be said beyond doubt that the treatment of the debentures in the light of the overall provisions of the plan is equitable.

■ The Development Group objects also that the plan fails to treat the New Haven as having fiduciary obligations to the debtor. In particular, it would have the New Haven held liable for profits made on the purchase of the debtor's debentures at a discount, and for any profit of the New Haven resulting from the transfer of the Boston and Providence property in connection with any future merger involving the New Haven system. The New Haven as agent to operate the property of the debtor undoubtedly had certain obligations to the debtor which might be labeled as fiduciary, but these extend only to its activities in operating the property—"to conduct such operations in a fair and impartial manner." No authority has been pointed out for the proposition that under these circumstances the lessee operating under court order has any general fiduciary duty to the lessor, or that it cannot, independently of its activities as operating agent, acquire the securities or property of the debtor railroad without being accountable for profits. (327 I.C.C. 22)

■ Objection is made to the assignment by the plan of the Treasury and sinking fund shares to the New Haven. Considering the question of the disposition of these shares in itself, there is some merit to the contention that cancellation of the shares would be appropriate. However, within the framework of the overall plan the assignment to the New Haven was made for the benefit, not of the New Haven, but of the United States. The plan provides that any payment made on the CCBIs issued to New Haven for these shares is to be applied toward payment of the new bonds issued under the plan. This assignment was insisted on by the United States as a condition for its agreement to accept less than the full amount of its debenture claim, and to subordinate its first mortgage security to the equitable charge. Considered as part of the general plan, such a treatment of the shares was fair and not in any sense inequitable. (See 327 I.C.C. 16, 17)

One further objection to discuss and I am nearing the end, I hope. Litigation must end some time. Twenty-eight years for one beginning to feel the frost of old age are enough.

This objection concerns reorganization expense. Objectants argue that the sum of $550,000 which the plan provides for debts and reorganization expenses "is so inadequate as to constitute a denial to many participants, who have guided the course of the proceedings, the right to reasonable compensation for which Sec. 77(c) (12) provides * * *." (11 U.S.C. § 205(c) (12)). "Guided the course of the proceedings" is hardly an appropriate phrase.

■ Only services and disbursements which "must have been of benefit to all sets of interests in the estate" (Warren v. Palmer, 2 Cir., 132 F.2d 665, 668), that contributed to the "working" out of a plan, not an impedance to it, may be compensated for.

Approximate amounts to be paid for fees and expenses have been filed with the court.

■ The court finds the amount of $550,000 is more than a reasonable sum to be paid for fees and expenses of reorganization. (77(e) of the Bankruptcy Act)

It is patent that no plan of reorganization can be expected to satisfy completely the hopes, dreams, or even well-founded claims of all the interested parties. (Every ribbon in a reorganization case cannot be neatly tied.) The plan now before the court represents the fruit of

years of litigation and negotiation and compromise. The egg must be hatched. It represents a solution which all interested parties, except a minuscule dissident minority, are willing to accept as fair and reasonable.

■ After full consideration of the plan and the various objections thereto, the court concludes that the plan is fair and equitable, affords due recognition to the rights of the bondholders and stockholders and otherwise fully complies with the requirements of § 77 of the Bankruptcy Act.

An order will be entered approving the plan and a certified copy of this opinion and the order will be sent to the Interstate Commerce Commission.

CLASSIFICATION OF CREDITORS AND STOCKHOLDERS FOR THE PURPOSE OF VOTING ON THE PLAN. CREDITORS AND STOCKHOLDERS ARE CLASSIFIED IN THE FOLLOWING FIVE SEPARATE CLASSES.

*Creditors*

(1) The holder or holders of the Debtor's debentures.

(2) All other creditors, if any.

*Stockholders*

(1) The New Haven trustees as the beneficial owner of 15,918 shares of the stock of the Debtor.

(2) The holders of the 20,770 publicly held shares.

(3) The holders of the 40 shares of stock owned by the Debtor and held in its treasury, and the 3,272 shares formerly held in a sinking fund for Boston & Providence debentures comprise one class and are excluded from voting on the plan.