**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**In re CLAIMS OF SHAWMUT BANK OF BOSTON, N. A. as Trustee under Indenture of Equitable Charge.**

**No. 70–347.**

United States District Court, E. D. Pennsylvania.

March 22, 1978.

Edwin K. Taylor, Philadelphia, Pa., for Penn Central Transp. Co., Trustees.

Arthur P. Schmidt, Gaston, Snow & Ely Bartlett, Boston, Mass., for Shawmut Bank of Boston, N. A., Charge Trustee.

David H. Wice, Fox, Rothschild, O'Brien & Frankle, Philadelphia, Pa., Benjamin H. Lacy, Hill & Barlow, Boston, Mass., for Boston and Providence Reorganization Managers.

Armistead B. Rood, Boston, Mass., for R.R. Development Group.

Spencer Ervin, Jr., Gratz, Tate, Spiegel, Ervin & Ruthrauff, Philadelphia, Pa., for New Haven Trustee.

## MEMORANDUM AND ORDER NO. 3470

### FULLAM, District Judge.

The Boston & Providence Railroad Corporation ("B & P") was in reorganization under § 77 of the Bankruptcy Act for more than 30 years. A key ingredient of the ultimate termination of those reorganization proceedings was the purchase of all of the remaining B & P properties by the Penn Central Trustees on April 20, 1971, as authorized by Order No. 215 in these proceedings. The assets purchased by Penn Central included both trackage used for long-haul freight and passenger service, forming an integral part of the Northeast Corridor, and less essential trackage and other properties, suitable for sale as commuter lines, or for non-rail purposes.

In the formulation of the B & P Reorganization Plan and in the litigation surrounding it (the Plan was initially approved in 1968; the consummation order was entered in February 1971), it was established that the former stockholders of the B & P should be entitled to further distributions under the Plan if it should later develop that significant sales of B & P assets for other than long-haul rail use could be achieved. It was the position of the stockholder interests that, if the B & P assets were properly managed, it should be possible in the future to realize substantial amounts of cash from the disposition of portions of the property which might be freed from dedication to rail use, or which might be purchased by local commuter authorities. Pursuant to the B & P Reorganization Plan, therefore, stockholders were issued Certificates of Contingent Beneficial Interest ("CCBI's"), entitling them to participate, under certain conditions, in the proceeds of future sales of B & P assets. The Penn Central Trustees are the holders of some 49% of the outstanding CCBI's.[1]

As as matter of mechanics, the rights of the CCBI holders were formalized in the following manner: Immediately before the conveyance of the B & P properties to Penn Central, the B & P Trustee executed an Indenture of Charge to the Shawmut Bank of Boston, N.A. as Indenture Trustee (hereinafter, the "Charge Trustee") creating an equitable charge against the B & P proper-

---

1. In order to simplify the analysis, I have omitted one step. Penn Central's entire involvement with the B & P is as successor to the interests of the New Haven Trustee, as a result of the merger of the New Haven into the Penn Central.

ties for the benefit of the CCBI holders. The conveyance to Penn Central was made under and subject to this Indenture of Equitable Charge, and simultaneously with the conveyance, the Penn Central Trustees executed a document formally assuming the obligations of the grantor in the Indenture.

The Indenture gives the Charge Trustee the right to receive, on behalf of the CCBI holders, the future proceeds of certain "conveyances" as therein defined; and creates an equitable lien against such proceeds. It is clear, and undisputed, that the lien arises only with respect to conveyances occurring on or before December 31, 1978, and only with respect to conveyances involving a gross sale price of at least $500,000. A third requirement is at the nub of the controversy now before the Court. Article I, Section 5 of the Indenture, in defining the kind of "conveyance" which would give rise to the lien of equitable charge, includes the following language:

"Any . . . grant or conveyance to, any grantee except a railroad corporation or public authority succeeding directly or indirectly . . . to the freight and/or longhaul passenger business of the B & P Trustee or of the New Haven Trustees as the operators of the B & P. Any and all such excepted grantees shall be bound by and shall take subject to the equitable charge hereby granted. . . ."

After acquiring the B & P properties, the Penn Central Trustees completed a sale of certain commuter lines to the Massachusetts Bay Transportation Authority and, in conformity with their obligations under the Indenture, paid some $10.5 million to the Charge Trustee for the benefit of the CCBI holders.

As of April 1, 1976, pursuant to the Regional Rail Reorganization Act of 1973 (RRRA), 45 U.S.C. §§ 701 et seq., the Trustees conveyed substantially all of the remaining former B & P properties to Consolidated Rail Corporation (ConRail). As mandated by § 303(b)(2) of the RRRA, the conveyance was free and clear of all liens and encumbrances, and ConRail has not assumed the obligations imposed by the indenture of equitable charge.

It is the position of the Charge Trustee, the B & P reorganization managers, and certain individual holders of CCBI's, that the conveyance to ConRail falls within the ambit of the Indenture, and that the proceeds which may ultimately be received by Penn Central by reason of that conveyance (i. e., the Valuation Case recovery in the Special Court) should be subjected to the lien of the equitable charge in favor of the CCBI holders. The Penn Central Trustees and the New Haven Trustee disagree with that view.

## I. JURISDICTION

The first question to be decided is the proper forum for decision of the issues which must be decided. The Charge Trustee sought to intervene in the Valuation Case proceedings before the Special Court, ostensibly for the purpose of ensuring that the former B & P properties would be separately, and appropriately, valued in that litigation; but the Special Court declined to permit intervention. The Charge Trustee then petitioned the United States District Court for the District of Massachusetts (the B & P Reorganization Court) for instructions and for declaratory relief. The Penn Central Trustees contested the jurisdiction of the Massachusetts court, and obtained an indefinite postponement of the hearing so that an application might be made to this Court. The Trustees then filed the petition which is now before this Court, namely, their petition "for Adjudication of Claims of Shawmut Bank of Boston, N.A. as Trustee Under Indenture of Equitable Charge in respect of Trustees' Property Conveyed Pursuant to Regional Rail Reorganization Act of 1973, as Amended (Doc. No. 15110)." The B & P parties (the Charge Trustee, the reorganization managers, and certain CCBI holders) have responded on the merits, but have also sought dismissal or stay of the Penn Central Trustees' petition, pending determination of the issues by the Massachusetts Court. Essentially, the B & P parties contend that the Massachusetts

court has exclusive jurisdiction of the controversy, while the Penn Central Trustees and the New Haven Trustee assert that exclusive jurisdiction lies with this Court. Alternatively, if it should be held that the jurisdictions of the two courts are concurrent, each side argues that the court which it has selected is the preferable forum.

Analysis of the jurisdictional issues properly begins with an examination of the pleadings to determine the issues raised and the nature of the relief sought. The Charge Trustee's petition to the Massachusetts court seeks a "final judgment and decree instructing the Charge Trustee and declaring the rights and other legal relations of the Charge Trustee, PC Trustees, and CCBI holders generally in the premises and particularly in regard to the following": (1) whether the conveyance to ConRail is a "conveyance" as defined in the Indenture; (2) whether the Penn Central Trustees are required to hold the proceeds from the Valuation Case award in trust for the Charge Trustee, and pay the proceeds over to the Charge Trustee for distribution to CCBI holders; (3) whether the conveyance to ConRail constituted a default under the Indenture; (4) "the fiduciary responsibilities of the PC Trustees, as grantor, to the Charge Trustee (and indirectly to CCBI holders) to seek and obtain [in the Special Court, or in the Court of Claims, or elsewhere] maximum recovery, sale price, or award for the transfer [to Conrail];" (5) "the fiduciary duty of the PC Trustees . . . to seek and obtain . . . recovery for the benefit of CCBI holders of damages due to . . . diminution in value of the equitable charge on severed B & P real estate not included in the transfer . . ;" and (6) "if the Charge Trustee and CCBI holders are not entitled to receive net proceeds of the transfer from the PC Trustees under and by virtue of the indenture, the nature and extent of responsibility, if any, which the Charge Trustee may have in connection with compensation to which the holders may be constitutionally entitled, and by whom the Charge Trustee's resulting cost and expense must be borne." The petition also seeks general relief.

The petition of the Penn Central Trustees to this Court seeks a decree to the effect that the Charge Trustee is not entitled to have a trust declared on any proceeds received by virtue of the conveyance to ConRail and that the Penn Central estate is not liable to the Charge Trustee for damages by reason of the conveyance to ConRail.

Unquestionably, the Massachusetts court has exclusive jurisdiction to issue instructions to the Charge Trustee. To the extent that such instructions and guidance are being sought, there is no potential for conflict between the jurisdictions of the respective courts, and therefore no jurisdictional issue to be decided. The alleged conflict arises with respect to the merits of the controversy.

The jurisdictional powers conferred upon reorganization courts by § 77 of the Bankruptcy Act are extremely broad. However, the B & P Reorganization Plan was approved in 1968, and the final consummation order was entered in February 1971. That proceeding has now effectively terminated. Whatever residual § 77 jurisdiction still remains with the Massachusetts court stems from the reservation of jurisdiction contained in the consummation order of that court. The consummation order, entered February 23, 1971, expressly terminated "all jurisdiction of this Court in or by virtue of these proceedings" as of the consummation date, except as set forth in Paragraph 2 of the order. The only reservations arguably pertinent to the present dispute are the following: In Subsection (c) of Paragraph 2, the Massachusetts court reserved jurisdiction "to construe the Plan as to matters which may require construction, not dealt with in this order." And Subsection (g) of that paragraph reserves jurisdiction

"to take such further action as may be necessary to put into effect, enforce and carry out this Order and the Plan and all other orders relative thereto heretofore entered by this Court, provided, however, that nothing in this Paragraph 2 shall be construed as a reservation of jurisdiction to change the Plan or any of the rights

vested thereunder or any of the rights of the holders of the New Bonds or CCBI's or persons entitled to receive them."

I very much doubt that the language of Subsection (g) can properly be interpreted as a reservation of jurisdiction over the present dispute. The principal thrust of the argument of the B & P parties is that the Indenture of Charge forms a part of the Plan of the B & P, hence the present dispute, which involves interpretation of the Indenture, is within the reservation of jurisdiction expressed in Subsection (c). There are two difficulties with this approach. In the first place, Subsection (c) reserves jurisdiction to construe the Plan only as to matters "not dealt with in this order;" and the Indenture of Charge is dealt with in that order. More importantly, I believe the B & P parties are in error in contending that the Indenture of Charge is a part of the B & P Reorganization Plan. What is to be interpreted in this case is the Indenture, not the Plan.

█ I very much doubt, therefore, that the B & P Reorganization Court can properly be said to have exclusive jurisdiction over the essence of the controversy. But even if it should be held that such jurisdiction exists, it is very clear that this Court has jurisdiction (i. e., that the jurisdiction of both courts is concurrent), and that this Court is the more appropriate forum. The assets were acquired by the Penn Central Trustees, and their management and disposition is plainly within the realm of this Court's § 77 jurisdiction. The chose in action being asserted in the Valuation Case litigation is a most important asset of the Penn Central estate; the manner in which the proceeds from that litigation are to be distributed is a pivotal feature of the Penn Central Reorganization Plan recently approved by this Court. The B & P parties seek to impose a lien upon that asset, and a direction to the Penn Central Trustees concerning their conduct of the Valuation Case litigation. The notion that the B & P Reorganization Court is a proper forum for deciding those issues seems exceedingly far-fetched, and is contrary to the tenor of the

case law on the subject. *See, Warren v. Palmer,* 310 U.S. 132, 140, 60 S.Ct. 865, 84 L.Ed. 1118 (1940); *In re N.Y., N.H. & H.R. R.R.,* 457 F.2d 683, 688–89 (2d Cir. 1972), *cert. denied sub nom., Smith v. Baker,* 409 U.S. 890, 93 S.Ct. 106, 34 L.Ed.2d 147 (1972).

## II. ARBITRATION

Before the Massachusetts court, the reorganization managers of the B & P sought to have the dispute referred to arbitration. At the hearing in this Court, the other B & P parties orally joined in that request. As I understand the positions of the B & P parties, their first choice would be to have this Court defer to the jurisdiction of the Massachusetts court, but if this Court exercises jurisdiction, their second choice would be to have this Court require that the dispute be submitted to arbitration.

Article VII of the Indenture of Charge includes the following language:

"Any dispute or disagreement between the Charge Trustee and/or the Director of Development and the Grantor in defining a Transaction, as to the amount of the gross sale price or award or the net proceeds from any Conveyance, as to whether or not railroad operations can be adjusted so as to release railroad property from operating classification, or otherwise arising with respect to the provisions of Paragraph 3 of the Plan, shall be settled by arbitration in the following manner. . . ."

As I read this arbitration clause, however, it does not apply to the present controversy. There may be a disagreement "in defining a Transaction" but not "in defining a Transaction, as to the amount of the gross sale price . . . as to whether or not railroad operations can be adjusted so as to release railroad property from operating classification . . . ;" nor does there seem to be a dispute "otherwise arising with respect to the provisions of Paragraph 3 of the Plan."

█ As discussed below, I do not rule out the possibility that issues properly arbitrable under this language may arise in the future, but the present dispute, which boils

down to purely legal questions concerning the continued efficacy of the Indenture of Charge in light of the subsequent enactment and implementation of the RRRA, is not covered by the arbitration clause. Moreover, these issues are wholly unsuited to the arbitration process contemplated by Article VII of the Indenture. It seems reasonably clear that the parties intended to require arbitration of disputes which were principally factual in nature, or matters of business judgment. No useful purpose would be served in referring the present dispute to arbitration, since even the narrowest scope of subsequent judicial review would presumably enable this Court to correct what it might regard as a plain error of law.

Finally, I believe it would be an impermissible abdication of the function of a § 77 reorganization court to defer to a ruling by arbitrators in this situation, with its potential for interference with the Trustees' crucially important task of conducting the Valuation Case litigation. Apart from all other considerations, therefore, I should feel constrained to refuse to enforce any arbitration clause if construed so as to have that effect.

## III. THE MERITS

■ In essence, the B & P parties view the issue before the Court as a matter of construing the language of the Indenture to determine its impact upon the transactions mandated by the RRRA, whereas the Penn Central parties view the dispute as a matter of determining the impact of the RRRA upon their respective obligations under the Indenture. Both approaches are correct, two sides of the same coin; but the differences in emphasis must not be permitted to obscure the fact that the parties are confronted by circumstances which were simply not within the contemplation of any of the parties when the Indenture of Charge was executed.

The overall intention of the parties is reasonably clear. As stated by the Administrative Law Judge of the Interstate Commerce Commission in approving the B & P Plan:

"The purpose of the CCBI's is to protect the interest of the Debtor's shareholders in the extraordinary gains which might be realized if, after the Debtor's properties are transferred to the New Haven or a successor, the properties, or any portion of them, were acquired for use in connection with mass transit programs, highway programs, highway construction, urban redevelopment or similar ventures." *Boston & Providence R.R. Reorganization*, 327 ICC 10, 26–27 (1966).

In approving the B & P Reorganization Plan, the Commission itself stated:

"The purpose of the CCBI's is to permit the public stockholders to share in potential windfalls on gains resulting from the sale of the Debtor's non-operating property. . . ." *Boston & Providence R.R. Reorganization*, 327 ICC 22.

As stated by the B & P Reorganization Court:

"These provisions were included because of the potential value of certain portions of the debtor's real estate, based on the price which would be received for this land if it should be sold or taken for highway or rapid transit purposes." *In re Boston & Providence R.R.*, 260 F.Supp. 415, 419 (D.Mass.1966).

And finally, the same view was expressed by the First Circuit Court of Appeals:

"[The purpose of the CCBI's is] to allow further receipts for stockholders in the event that the potential for sale of real estate for nonrailroad uses should be realized." *In re Boston & Providence R.R.*, 413 F.2d 137, 140 (1st Cir. 1969).

The Indenture of Charge was designed to carry out those intentions. Its obvious purpose was to make certain that the CCBI holders would participate in the benefits of major sales of "surplus" property which might occur on or before December 31, 1978, but not in sales beyond that date, and not in sales or other transactions involving conveyance of the long-haul rail lines of the B & P. To accomplish their purpose, the drafters of the Indenture of Charge includ-

ed three provisions, which must be interpreted together: (1) In defining the kind of "conveyance" the proceeds of which would inure to the benefit of the CCBI's, all transfers to a carrier which would continue to be responsible for the operation of the long-haul service were specifically excluded; (2) any such carrier-purchaser would stand in the shoes of Penn Central, and be subject to the obligations of the Indenture with respect to future transactions it might carry out; and (3) if the succeeding carrier did not assume the obligations of the Indenture of Charge, the conveyance or transfer to such carrier would be null and void.

As a result of the RRRA, and through no fault of any of the parties to the Indenture, there has now been a transfer of the properties to a carrier which continues to be responsible for the long-haul rail service, but which has not assumed the obligations of the Indenture of Charge, and cannot legally be required to do so.

The legal arguments advanced by the Penn Central Trustees are unassailable. The Indenture did not except from the term "conveyance" transfers in which the carrier-grantee declined to assume the obligations of the Indenture. It excluded all conveyances to succeeding carriers, but added provisions to guarantee that such successors would, or could be made to, assume the obligations of the Indenture. Quite simply, the Indenture never contemplated that there could be a transfer to a succeeding carrier who would not be bound by the Indenture. Fulfillment of this expectation has been rendered legally impossible by virtue of the enactment and implementation of the RRRA. This is not a case of breach of contract, but of frustration of contract by operation of law. Moreover, to accept the Charge Trustee's arguments and hold that the mandated conveyance to ConRail is a "conveyance" to which the provisions of the Indenture of Charge are fully applicable would produce a ludicrous result: The CCBI holders would benefit from a sale of the long-haul trackage for rail purposes, an outcome which no one can seriously suggest was intended by the parties to the Indenture.

But notwithstanding the force of the Trustees' legal arguments, the equities of the situation must be considered. This is, after all, an equitable proceeding. And the fact that the B & P parties have somewhat overstated their position does not necessarily mean that the equities are entirely one-sided. In my view, it is incumbent upon this Court to try to fashion a remedy which will leave all parties in substantially the same positions they would have been in if their original intentions had not become legally impossible of fulfillment. The *cy pres* doctrine provides a useful, although perhaps not exact, analogy.

In attempting to do equity between the parties, the following principles must be kept in mind: (1) The CCBI holders were intended to benefit only from sales of "surplus" property, not from sales of the continuing railroad; (2) only those sales which might occur before December 31, 1978, were intended to be included; (3) the principal transactions which were actually in the contemplation of the parties at the time the Indenture was executed have been carried out in conformity with the requirements of the Indenture; (4) given the history and legislative purposes of the Rail Act, and the Congressional directions to United States Railway Association in choosing the properties designated for conveyance to ConRail, there is at least a strong presumption that those former B & P properties which were conveyed to ConRail on April 1, 1976, were acquired by ConRail for continued rail use; (5) there is a corresponding presumption that the former B & P assets which were not conveyed to ConRail include substantially all of the potentially "surplus" properties intended to be covered by the Indenture; and (6) no one knows, or can now know, how the properties which were conveyed to ConRail will be valued, or when they will be paid for.

Within the limitations imposed by the foregoing factors, there is nevertheless room for some kind of claim by the Charge Trustee. It is conceivable, for example, that among the assets conveyed to ConRail there are former B & P properties which, but for the RRRA, would have been dis-

posed of by Penn Central, before December 31, 1978, for non-rail purposes, and which would have commanded prices in excess of $500,000. Given the relatively short span of time between April 1, 1976 and December 31, 1978, and the thorough and accurate inventory of major property holdings maintained by the Trustees, it should be possible to identify any such parcels.

But that, of course, is only the first step. Before the Charge Trustee would have a claim, it must be made to appear that, as a result of the conveyance of such parcels to ConRail, the Penn Central estate has received benefits, attributable to assets in that category, in excess of $500,000. At the present time, it is simply impossible to determine whether that kind of proof can ever be forthcoming.

In their motion papers, the parties have suggested only two parcels in the specialized category referred to above. While this list may not be complete, the two parcels mentioned do illustrate some of the difficulties involved. There is a reference to a certain railroad yard which, according to the Charge Trustee, Penn Central might well have sold, for industrial purposes, for approximately $900,000. ConRail has now acquired about half of this property, but for rail use. It is conceivable that Penn Central will eventually derive from the Valuation Case litigation a recovery which reflects severance damages, in which event the argument could be made that such damages should be added to the price for which the balance of the tract is sold, in computing the $500,000 floor. On the other hand, no such severance damages may be identifiable; and the remainder of the parcel still owned by Penn Central may not be sold before December 31, 1978.

In the other example cited by the parties, it appears that the April 1, 1976 conveyance to ConRail included an option on the part of ConRail to acquire Penn Central's interest in a certain passenger station. ConRail has since exercised the option. Penn Central was allegedly negotiating a sale of this property to a state agency. Some or all of this property has since been conveyed by ConRail to Amtrak, as part of the latter's acquisition of the Northeast Corridor, and Amtrak has conveyed, or may convey, the property to a state or local commuter agency. Needless to say, the relationship between ConRail, Amtrak, and the local commuter agency is such that the price paid by the ultimate purchaser may have little or no bearing upon what Penn Central receives for the property. Moreover, it is at least an open question whether the totality of the circumstances would lead to the conclusion that the Indenture of Charge has no bearing upon this parcel.

If the Valuation Case is litigated to finality, the final award may be based upon findings by the Special Masters which would be sufficiently detailed to shed some light on the issues between the B & P parties and the Penn Central Trustees. If the litigation terminates in a settlement, it might nevertheless be possible to arrive at a reasonable approximation of the benefits attributable to the parcels in which the CCBI holders had a contingent interest. On the other hand, the final outcome of the Valuation Case (itself a consequence of the RRRA) may leave these issues hopelessly obscure.[2] The point is that the CCBI holders' entitlement, if any, is dependent upon factual determinations which cannot now be made.

I have concluded, therefore, that while it would not be appropriate to grant the Penn Central Trustees' petition in full, there can be no assurance that the Charge Trustee will be entitled to relief; and that immediate action for the protection of the interests of the CCBI holders should be quite limited. The Penn Central Trustees must be permitted to pursue the Valuation Case litigation for the best interests of the Penn Central estate, without interference from the Charge Trustee or the CCBI holders. And there is no conceivable basis for damage

---

2. Depending upon the valuation theory or theories finally adopted by the Special Court, one possible approach might be to analyze Penn Central's proofs to determine what percentage of the total claim is attributable to properties in which CCBI holders may have an interest, and thereafter apply that percentage, in some appropriate fashion, to the actual award. The relationship between the result of that computation and $500,000 would be significant.

claims against the Trustees or the Penn Central estate by reason of the fact that ConRail has not assumed the obligations of the Indenture of Charge, or by reason of the fact that the RRRA-mandated conveyance has made it impossible for Penn Central and the CCBI holders to reap benefits which might have been available in the absence of the conveyance. All that the Charge Trustee and CCBI holders have a right to expect is that Penn Central not be permitted to receive and retain benefits which, under the Indenture, should go to the CCBI holders. While the existence and amount of any such shareable benefits cannot be determined until the final outcome of the Valuation Case, I believe a start can be made toward a resolution of the controversy, by attempting to identify at this time those parcels, if any, which might reasonably have been expected to be sold before December 31, 1978, for prices in excess of $500,000. The parties may well be able to reach agreement on that issue; if not, either party may request a further hearing in this Court. The parties may wish to consider the possible desirability of waiting until after December 31, 1978, for final designation of such parcels, if any, if it should appear that the actual fate of those parcels in the hands of ConRail is relevant to the designation.

